Mr. Justice Cox
delivered the opinion of the Court:
I am requested to deliver the opinion of the court in the case of the United States vs. Howard J. Schneider, indicted for the murder of his wife, Amanda M. Schneider, in this city, on the 31st day of January, 1892.
*384 The defendant having been convicted in the Criminal Court, áppealed to this court.
The record of the trial contains between 100 and 200 exceptions, and the record and brief embrace some 540 pages of printed matter. The case has been argued at great length, with remarkable ability and exhaustive learning, and its proper examination by us has required much time and labor, and has been conducted with an earnest desire, in arriving at a conclusion, to pay a due regard alike to the rights of the prisoner and the demands of public justice.
I shall not undertake to examine the several exceptions in detail, but will confine myself principally to an examination of the questions which are raised by them. The record also presents so many questions that it is impossible to discuss them all at length, and as to some of them, we shall content ourselves with a general expression of opinion, without consuming the time that would be necessary to sustain it by reasoning and authority.
The first question arose on a motion to quash the indictment because there was no averment as to the place where the alleged offence was committed, so as to bring it within the jurisdiction of this court. The caption of the indictment contains the words “ District of Columbia, County of Washington,” and the body of the indictment describes the place as at and in the County and District aforesaid. It is claimed that the caption is no part of the indictment, and therefore the reference does not remedy the omission of a proper description in the body of the instrument.
We think this question depends entirely upon local practice. Where the practice is for the clerk of the court to add the caption, of course the indictment, as it comes from the grand jury, would be defective in the shape which the present one bears. But where, by the practice, the caption is a part of the indictment as it comes from the hands of grand jury, the rule is different. It was so held- in Massachusetts, where the latter practice prevails. See Comm. vs. Edwards, 4 Gray, 1. And such has been the practice here. *385 Such was the form of the indictment in the Sickles case and afterwards in the Guiteau case, in neither of which does the present question appear to have been raised.
This objection was raised on a motion in arrest of judgment, as well as on the motion to quash.
The defendant was arraigned on the 15th of February, and the trial set down for the 7th of March. On the latter day a motion was made for a postponement of the trial, principally on the ground that the prisoner’s counsel had not hadi time to (prepare for the defence, and hadl encountered certain difficulties in collecting the information necessary therefor, and because there existed in the public mind a feeling of hostility towards the prisoner that would strongly tend to prevent him from having a fair trial at that time. The motion was overruled and an exception reserved;
The defendant wajs. not called upon to make his defence until the 19th of March, and the trial was not closed by a verdict until April 9th.
A motion of this kind is necessarily addressed to the sound discretion of the court, and it is extremely difficult for a reviewing court to determine when that discretion has been so abused as to amount to error.
The application of the defendant was very general in its averments. It did not show the impossibility of procuring any testimony at that time which was known to defendant; it complained rather of a want of time to search for testimony. In fact, all the witnesses who could be expected to know anything of the facts were to be found within a very narrow circle, and whatever might be the aspect of the case at that time, it is sufficient now to say that the record of the trial shows that the defendant had no difficulty in procuring all the testimony that was available for him and, in that respect, did not suffer from the action of the court.
As to the condition of the public mind towards the prisoner, no special showing was made, nor had the court any reason to suppose that more prejudice existed than in all cases in which a great crime is thought to have been com *386 mitted. If the application could have been granted as prayed, i. e,, "for such time as will be reasonably sufficient to allow the prejudice to be allayed,” it would have involved an indefinite postponement of the trial.
While the prisoner is not to be hurried to conviction to satisfy public clamor, it must be remembered, at the same time, that the public interest requires prompt investigation and punishment of crime. The record does not make any showing of such public clamor, in reference to the present case, and unless the court can see that under such influence the jury has been hurried into an unjust verdict, no case is presented for a new trial on this ground. Wharton’s Crim. Plead. & Prac., Secs. 598, 601 and 689, and cases cited.
We cannot discover in the action of the court on this motion any ground for reversal.
Perhaps the most important question involved in the case relates to the qualifications of the jurors summoned and the prisoner’s right of challenge.
The defendant challenged, for principal cause, a number of jurors who were summoned and examined on their voir dire, on the ground that they had formed and expressed an opinion as to his guilt or innocence, and in each case where his challenge was overruled, reserved an exception. He complains that at least two jurors who were thus challenged and were legally incompetent, and certainly objectionable to him, remained on the panel, and that he was unable to remove them, or others whom he might- have been rid of, because he had exhausted his twenty peremptory challenges and had been compelled to use a large proportion of them in getting rid of jurors who ought to have been adjudged incompetent.
After a careful examination of this subject, we are all agreed that if a juror is erroneously adjudged competent over the challenge of defendant for cause, and the defendant is compelled to challenge him peremptorily in order to exclude him from the panel, and when the jury is completed and ready to be sworn, he has exhausted his peremptory *387 challenges, the error-is an injury to him, and is ground for reversal of the judgment against him. If he still has peremptory challenges which he does not choose to make use of, he has no ground of complaint. Of course, an error in overruling a challenge for principal cause, of a juror who is actually sworn bn the panel, is necessarily ground for reversal.
This general doctrine is stated in People vs. Casey, 96 N. Y., 116. It is assumed in Burt vs. Panjaud, 99 U. S., 180, and in the case of U. S. vs. Neverson, 1 Mackey, 176.
The same rule is asserted in Hopt vs. Utah, 120 U. S., 430. The court say: “Notwithstanding the peremptory challenges made by the defendant to two of the jurors, he had several such challenges which had not been used, when the jury was completed. If, therefore, the ruling of the court in disallowing the challenges to the two for bias, actual or implied, was erroneous, no injury to the defendant followed. Those jurors were not on the jury, and impartial and competent jurors were obtained in their place, to whom no objection was made.”
We have procured the record and briefs in this case, and find an explanation of this language in the fact that when the jury was sworn, the defendant had still four peremptory challenges which he had not chosen to make use of; and in the brief of the counsel for the government of Utah, the prisoner’s objections to three of the jurors for cause, whom he had peremptorily challenged, were met with the answer that if the court had sustained his challenges, the only, difference would have been, that he would have had seven, instead of four, useless peremptory challenges.
The same rule is recognized in Spies vs. Illinois, 123 U. S., 168, but through a strange oversight it seems to be misapplied to that case. See the same rule asserted in Wharton’s Crim. Plead. & Practice, Secs. 693-695.
And it may be added that in all the cases where it. is said that an error in overruling a challenge for cause, followed by a peremptory challenge, does no injury to the defendant, *388 the statement is qualified by the condition that he still has peremptory challenges left, when the jury are sworn.
In this case the defendant had exhausted his peremptory challenges before the jury was completed, and we are therer fore compelled to review the rulings of the trial justice on the challenges for cause, both to the jurors who are sworn and to those who were adjudged competent against the challenges for cause, by defendant, and afterwards by him peremptorily challenged.
And this brings us to consider the question under what circumstances the previous formation and expression of an opinion as to tjié guilt or innocence of the accused disqualifies a person from serving as a petit juror on his trial.
The Federal and State constitutions guarantee to an accused the right to be tried, not by a jury who have formed no opinions, but by an impartial jury.
By the old common law, the formation of a previous opinion did not disqualify one from serving as a juror unless it indicated malice or prejudice against the accused. But from a very early period, in this country, that a juror had formed an opinion as to the issue to be tried was held good ground for a challenge for principal cause. The courts, however, were not agreed as to the character of the opinion, or the source whence derived, which should give it that effect.
Chief Justice Marshall, in Burr’s Case, said that “light impressions which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror, but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which combat that testimony and resist its force, do constitute a sufficient objection to him.”
It is now conceded, on all hands, that if the opinion or impression of the juror is derived from mere rumor or newspaper accounts of a transaction, and is merely hypothetical *389 or conditional, the juror tacitly discounting these reports and mentally allowing for exaggerations and mistakes, and being free from any actual prejudice or bias against the accused, the opinion is no obstacle to his competency.
On the other hand, many authorities hold that if the opinion is a fixed and decided one, it is a disqualification. 36 Amer. Dec., 521 et seq. But here again, what shall be deemed a fixed and decided opinion, and what shall be sufficient evidence of it, are questions which it is not so easy to answer.
In every capital case, each juror, on his voir dire, is plied with questions by the prisoner’s counsel, whether he has formed an opinion — whether it is a decided one and will require evidence to remove it, and strong evidence — and can be generally led to answer all these leading questions in the affirmative, partly from a willingness to escape jury service and partly from want of appreciation of the terms employed. It seems to me not unlikely that this practice, which is calculated to retard and embarrass trials, has led to the passage of laws in a number of the States, of which that of Illinois, cited in Spies vs. Illinois, 123 U. S., is a sample, providing, in substance, that in the trial of criminal cases, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or newspaper statements, shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that'he believes he can fairly and impartially render a verdict in accordance with the law and the evidence, and the court shall be satisfied, of the truth of the statement.
The philosophy of this legislation seems to be, that while the constitution guarantees an impartial jury, it is 'competent for the legislature to provide a rule of evidence as to such impartiality. Especially should this be so when we consider how vague and indefinite are the terms by which the opinions of jurors are characterized, and how the decisions of the courts have failed to furnish any certain and universally accepted rule on this subject. See Stokes vs. People, 53 N. Y., 164.
*390 In the case of Cooper vs. State of Ohio, 16 Ohio St., 328, the court on this subject, said:
“ As to the character of opinions, the existence or expression of which should be regarded as sufficient evidence of the disqualification of a juror, the practice of the courts has not been uniform. All agree that he should be impartial. The diversity has been as to the rules of evidence that should be observed in practice, in ascertaining the required fact. The statute in question does not require or authorize the admission into tire jury of a partial or prejudiced juror. It only permits the courts- to accept the persons to whom it applies, as jurors, after being satisfied, from all the evidence disclosed, that they will render an impartial verdict upon the law and the evidence — in other words, that they have the' qualifications which the constitution requires jurors to. possess. The constitution does not prescribe rules of evidence; it only requires the fact of the impartiality of the juror to exist; and a statute cannot be said to, contravene its guaranty, which leaves the judicial mind free to find the fact, from the evidence submitted, according to the truth. The statute merely prescribes, as a rule of evidence, that-opinions formed, or formed and expressed, founded upon newspaper statements or reports, or rumor or hearsay, and not upon conversation with witnesses of the transaction, or hearing them testify, shall not be conclusive evidence of the incompetency of the juror, and thus render all further inquiry unnecessary and- unavailing. Nor is the opinion of the juror that he will be able to render an impartial verdict to be regarded, under the statute, as conclusive of competency. It is only a circumstance for the consideration of the court in connection with the nature of the opinion, and of the information upon which it may be founded, and all other matters elicited on the examination, throwing light upon the question- as to the impartiality of the juror. If, from the investigation, the court is satisfied that the character of the opinion is such that it will not interfere with the juror’s rendering an impartial verdict, it is authorized to *391 admit him to the jury; but if not satisfied, he is to be rejected.
“ The design of the statute was to obviate the difficulty, experienced in practice, in obtaining jurors, in criminal cases, from the better informed class of citizens. Crimes, especially of the graver description, are more likely than ordinary current events to become notorious in communities where they are committed. And the more intelligent and better informed the community, the more extended this notoriety becomes. The general extension of education in the community, and the multiplied and constantly increasing facilities afforded by the press and other means for the general dissemination -of current events among the people, render the rule of evidence prescribed by the statute, in the class of cases to which it applies, necessary and wise, and, in our opinion, leaves the constitutional rights of the accused unimpaired.”
But apart from this legislation, the trend of judicial thought is in the same direction. As far back as Wormeley’s Case, 10 Grattan, 687, decided in 1852, Judge Daniel said:
“ It is well settled that the question as to the competency of a juror is to be tested by the character and force of the opinion which he has formed, and not by the occasion on which the opinion was formed or the source from which the information of the juror may have been derived. Still, as it is natural to expect that the impression or opinion of the juror would be stronger or weaker as the information or evidence on which it is formed is more or less full and authentic, it often becomes necessary, when doubt is felt, from his statements, to look to his source of information, as a very important circumstance in explanation of this doubt. If, upon the whole examination, it appears that the opinion is decided and substantial, the juror is incompetent, and, on the other hand, if the opinion appears to be merely hypothetical and so slight that it would in all probability readily yield to evidence, his competency is established.”
*392 I cite this to show that even at that time the juror’s competency was to be determined, not by himself, by any declaration, however positive, but by the court, upon his whole examination, considering the source of his opinion and determining its strength from all the circumstances.
Without multiplying references to State decisions, I refer to one or two later cases. The first one is the case of Clark vs. Commonwealth, 123 Penn. St., 555, decided in 1888. In that case it appears, that at the trial a juror stated that he had read the report of the coroner’s inquest in the paper, and had formed a fixed opinion with reference to the guilt or innocence of the accused; that it had been deliberately formed and was still entertained; that it would take strong evidence to remove that belief. He further said his opinion was subject to the evidence, and that he could make his verdict wholly from the evidence.
Another juror said that, from what he had read and heard, he had formed and expressed a fixed and determined opinion, made after deliberation, and had heard nothing to change it. Then again, “ I certainly formed that after I read the accounts. Q. A fixed and determined opinion? A. Until I hear something further to contradict it. Q. Then you would have to have such evidence as a juror as would remove a fixed and determined opinion before you would change your mind. A. I would have to have some truth of it. Q. You have made up your mind? A. So far as I have heard and read reports.”
Another juror: That the evidence would have to be strong to induce him to change his opinion; that he lived about five miles from the scene of the crime. “ Q. You say you still have an opinion on this subject? A. Yes, sir, I have an opinion. Q. When you would go into the jury-box you would already have formed an opinion — you have an opinion now? A. Yes, sir. Q. And you will hold on to that until there is enough evidence to change your mind? A. Yes, sir.”
All these jurors were challenged for cause. The court, McCollom, Justice, said:
*393 “ The four assignments of error which relate to the action of the court below on defendant’s challenge of jurors for cause, involve the question whether the jurors so challenged had such opinions of the guilt of the accused as rendered them, under the decisions of this court, incompetent to serve. As a fixed opinion denies to evidence its proper effect, and prevents an impartial trial, it is a disqualification of the juror. Whether the juror has such an opinion is to be determined upon evidence, and the usual and proper practice is to examine him on his voir dire as to the opinion he has formed. If from the evidence elicited by such examination it is found that he has a fixed opinion, the challenge is sustained; if it is not so found, the challenge is overruled. The disposition of the challenge depends on the finding of a fact, and in passing upon such finding here, we must consider the evidence as a whole and remember that the examination was in the presence and under the direction of the court below, and that it had better opportunity to discover the nature and character of the opinion held by the juror than is afforded this court in review.
“ A juror in the course of his voir dire examination, and in response to some question addressed to him, may say that he has a fixed opinion, while his answers, taken together, may satisfactorily show that this is a misdescription of the opinion he holds. An isolated answer is not decisive of the question under investigation, but it must be determined upon the whole evidence affecting it. A careful study of the evidence of jurors Riggle,- White, South and Dulaney, has failed to convince us that either of them had a disqualifying opinion. We think that under the decisions of this court in Staup vs. Commonwealth, and previous cases, they were competent jurors. The assignments which relate to the qualification of jurors are not sustained.”
I think it proper also to read a brief extract from the case of O’Meara vs. Commonwealth, 75 Penn. St., 428. There the juror had formed an opinion; and he thought that opinion would follow him to the jury box if he had no evi *394 dence against it and would influence him if he had no other evidence. But he said further that he would follow the evidence, and the opinion would not influence his judgment. The court said;
“This case presents a test of the principle laid down in Staup vs. Commonwealth, and we must either recede, and go back to the practice of an age when ignorance of passing events constituted a characteristic of the times, and exclude every juror who had formed any opinion, even the slightest; or we^must stand abreast with the present age, when every remarkable event of to-day is known all over the country to-morrow, and exclude those only whose opinions are so fixed as to be prejudgments, or have been formed upon the known evidence in the cause. It is needless to say the world moves and carries us with it, and if we lag behind we must commit the trial of the most important' causes in life to those so ignorant that their dark minds have never been smitten by the rays of intelligence.”
In the case of Blackman vs. State of Georgia, which was decided in 1888, a juror had declared: “ I believe he, the defendant, is guilty because two juries have found him guilty.”’ In that case, too, the question arose whether it is competent for the legislature to prescribe the rules of evidence to procure an impartial jury. The court said:
“ A juror is not disqualified by a loose and vague opinion as to guilt or innocence, unless it has been generated by seeing the crime committed or hearing the evidence on oath; and such was not the origin of the opinion expressed by this juror. It is natural and proper for every citizen to have some opinion in favor of the correctness of'the verdicts of juries; and if following out so general and innocent a law of the human mind is to disqualify all the citizens, we see not how a man could be tried a second time for the same offence if the jurors put upon him had heard of his previous conviction. The belief entertained and expressed by the juror was apparently altogether intellectual, wholly free from any admixture or complication with the emotions or passions.”
*395 But the most important expression of opinion on this subject is that of the Supreme Court of the United States in the case of Spies vs. Illinois.
In that case a petition was addressed to Mr. Justice Harlan, and by him referred to the full court, for a writ of error to the Supreme Court of Illinois, upon the ground that the statute of that State, as interpreted by its courts, had denied to the petitioners the right to an impartial jury, guaranteed to them by the constitution of Illinois, and also by the constitution of the United States, by virtue of the Fourteenth Amendment.
It set forth the statute before mentioned, and averred that the criminal court of Cook county held that said statute-controlled as to the qualification of jurors, and that under this statute a man was a qualified juror and not subject to-challenge for cause /on account of prejudice or partiality,, notwithstanding any opinion formed and expressed by him touching the guilt or innocence of the accused, which opinion was based on what he had heard and read touching the matter inquired of, and, notwithstanding the proposed juror stated that he still entertained the opinion that the defendants, or some of them, were guilty as charged, or upon the question of their guilt, and that he still believed to be true the accounts heard and read by him; and that his opinion was so fixed that it would require evidence and even strong-evidence to change that opinion; provided only the juror would state that he did not know that he had expressed any opinion as to the truth of the reports and believed he could; render a fair and impartial verdict upon the evidence. It further averred that the ruling of the Cook county court had been sustained by the Supreme Court of Illinois.
The petition raised the direct question whether a juror who avowed an opinion formed from what he had read and heard, so fixed that it would require strong evidence to re-*rnove it, was such an impartial juror as the constitution entitled the accused to, even where he stated that he could render a fair and impartial verdict in the case according to the law and evidence. The Supreme Court say:
*396 “ At the trial the court construed the statute to mean that ‘ although a person called as a juryman may have formed an opinion based upon rumor or newspaper statements, but has expressed no opinion as to the truth' of the newspaper statements, he is still qualified as a juror if he states that he can fairly and impartially render a verdict thereon in accordance with the law and the evidence, and the court shall bib satisfied of the truth of such statement. It is not a test question whether the juror will have the opinion which he has formed from newspapers changed by the evidence, but whether the verdict will be based only upon the account which may be given'here by witnesses under oath.’
“ Interpreted in this way, the statute is not materially different from that of the Territory of Utah', which we had under consideration in Hopt vs. Utah, and to which we then gave effect. As that was a territorial statute passed by a territorial legislature for the government of a territory over which the United States had exclusive jurisdiction, it came directly within the operation of Article VI. of the amendments, which guaranteed to Hopt a trial by an impartial jury. No one at that time suggested a doubt of the constitutionality of the statute, and it was regarded, both in the territorial courts and here, as furnishing the proper rule to be observed by a territorial court in empanelling an impartial jury in a criminal case.”
And then, after referring to several State decisions sustaining the constitutionality of similar statutes, the court say:
"Without pursuing the subject further, it is sufficient to say that we agree entirely with' the Supreme Court of Illinois in its opinion in this case, that the statute on its face, as construed by the trial court, is not repugnant to Par. 9 of Art. 2 of the constitution of that State, which guarantees to the accused party in every criminal prosecution, ‘ a speedy trial by an impartial jury,’ &c., &c. As this is substantially the provision of the Constitution of the United States, on which the petitioners now rely, it follows that even if their position *397 as to the operation and effect of that constitution is correct, the statute is not open to the objection which is made against it.”
We have no such statute in this District, but we have the constitutional guarantee of an impartial jury, and the application of the decisions in Hopt vs. Utah, and Spies vs. Illinois, is that they enlighten us as to the meaning of those terms.
The statute of Illinois declared the competency of the juror, although he had formed an opinion based upon rumor or newspaper report, about the truth of which he had expressed no opinion.
•The Utah' statute declares him competent, though he has both formed and expressed an opinion.
The Supreme Court Of the United States held both statutes consistent with the constitution.
The Supreme Court, by approval of the legislation referred to, as constitutional, substantially decides that a juror will come within the requirement of impartiality, although he may have formed and expressed opinions based upon rumor or newspaper accounts, and although he may require evidence to change his opinion, if notwithstanding this, he can, in his own opinion and in the judgment of the court, render an impartial verdict, according to the law and the evidence. In line with this, is the case of Garlitz vs. The State, 71 Md., 293. Moreover, as the statutes referred to speak of opinions generally, they make no discrimination between such as are called fixed or decided ones and any others.
We feel it our duty to follow the lead of the Supreme Court on this subject, in the direction of settling the law on this vague and vexed question of the competency of jurors, on which no well defined and settled rule has obtained in this District.
Again, in the case of Reynolds vs. United States, 98 U. S., 145, the Supreme Court say:
“ In these days of newspaper enterprise and universal *398 education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause, the court will practically be called upon to determine whether the nature and strength of the opinion formed are .such' as in law necessarily raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tided, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. . . It must be made plainly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the conscience or discretion of the court.”
Cases can well be conceived of in which the ruling of the trial justice should be reversed. If, for example, a juror should avow a decided prejudice against the accused and an opinion which no evidence could remove, and declare his inability to hear the evidence impartially, and there should be no other statements in relief of these, it would be error to adjudge him competent.
And so, if he has attended a former trial, or, perhaps, if he has read authentic accounts of it, with all the evidence on both sides, and has formed definite conclusions from it, he ought to be excluded. Here, however, a distinction should be taken between this case and the mere newspaper reports of preliminary inquiries, as at coroners’ inquests, where every one knows that the testimony is one-sided and partial. This distinction is recognized by the Supreme Court of Pennsylvania in the case of Allison vs. Commonwealth, 99 Pa. St., 32.
*399 But between the state of conviction arrived at in one of the two ways above mentioned, and a condition of absolute vacuity of thought, lies a field which is to be covered by the sound judgment and discretion of the trial justice. We hold that the declaration of one called as a juror that he has a decided opinion and one that requires evidence and even strong evidence to remove it, is entirely inconclusive as to his competency. Neither is his belief that he can hear and decide impartially. If the court should believe that he has a rooted conviction of the prisoner’s guilt, the latter declaration would not relieve his incompetency, and so a number of the cited cases hold. But, on the other hand, the very declaration of this belief, if sincere, raises a doubt as to the question of his decided opinion. The two statements qualify each other and are to be taken together, and the court is to .judge from the whole examination which is more likely to be correct. It is hardly necessary to say that the trial justice has the advantage of a reviewing court in this inquiry. He judges from not only the words of the juror, but his demeanor, and perhaps from his personal knowledge of his character — all sources of opinion which cannot be conveyed in the record.
When we come to examine the question of the sufficiency of the challenges for principal cause, we find that only two jurors so challenged were actually sworn on the panel. One of them, Robert Gray, when first interrogated, had no opinion; then, under the leading of the defendant’s counsel, he had formed an opinion; then he had now no particular opinion; then he had an opinion which it would take pretty strong evidence to remove, and finally, he declared that he could hear the evidence and render an impartial verdict in accordance with it. In view of this vacillation, the trial court could hardly be in error for ruling that the juror had no such fixed and settled opinion as to disqualify him.
The second juror, Lewis, like many of the other jurors, had formed an opinion from the accounts published in the papers, strong and decided, which would require strong evi *400 dence to remove, but, after all, could listen to the evidence and return a verdict based upon it, entirely regardless of the opinion based upon what he had read.
Now, it is impossible for us to say that the court manifestly erred in this, for the juror may have given such evidences of moderation and fairness as to make his last statement entirely trustworthy.
The next inquiry would be as to the jurors who were challenged peremptorily after being adjudged competent over the challenge for principal cause. And in- reference to these, it may be said that although an improper ruling as to their competency is recognized as an injury, under the circumstances of this case, it is a theoretical and technical one only, and the court, at least, should not be astute to find errors in the disposition of a question so vague and so necessarily committed to the sound discretion of the trial court.
The strongest case of this class is that of Charles W. Morris. Like the others, he disavowed any bias or prejudice against the prisoner, but had formed an opinion from what he had read in the newspapers, including the proceedings at the coroner’s inquest. To the inquiry whether he could bring in a verdict based wholly on the láw and evidence, he replied, “ No, sir, I don’t know that I could.” But after-wards he said that his opinion would yield to evidence if it was clear and positive; and when again asked whether he could render a verdict according to the law, and the evidence, he replied, “ That is the only thing we have got to be governed by.” The principal difference between him and the other jurors was that he expressed a doubt of his ability to render a verdict according to the evidence. But to the trial justice, observing his demeanor, this may have rightly appeared to be a mistrust of himself, proceeding from a sensitive conscience, which would be his best equipment for the service required of him, and his declaration that there was nothing else but the law and evidence to be guided by, may have seemed, as it might to us, a sincere- recognition of duty.
*401 It is impossible for us to say that there was a manifest mistake in accepting him as competent. If there is a doubt as to such error, we have no right to overrule the decision.
If this is proper to be said of this juror, it applies with more force to the others of this class. They all disavow prejudice, have opinions derived from the same unauthentic source, and unlike Morris, profess themselves able to render verdict according to evidence. An evidence that the trial justice exercised considerable care in this examination is supplied by the fact that he, of his own motion, rejected some twenty odd persons called to be sworn, because in his judgment they had decidedly prejudged the case.
We are, therefore, unable to discover that there was any such manifest error in the selection and empanelling of the jurors as would justify us in a reversal of the judgment.
Before leaving the subject, it will be proper to notice the motion made to arrest the trial and discharge the jury on the ground that two of the jurors had, before the trial, used hostile expressions in reference to the prisoner. It is sufficient to say that the counter affidavits filed sufficiently disposed of that question. And we may refer to a decision reported in United States vs. Upham, 2 Mont., 170, which holds that an affidavit charging a juror in a murder case with having expressed an opinion which disqualified him from serving, is offset by an explicit denial by the juror under oath.
Another question relates to the declarations of Mrs. Schneider and her sister, Jennie Hamlink, made immediately after the shooting, which were offered in evidénce as parts of the res gestae.
The case of Insurance Company vs. Mosley, 8 Wall., 397, has (settled the law, for us, that the declarations of an injured party, made immediately after the injury was inflicted, may be received not only to show the nature of it, but also to show the cause. And this is decisive as to Mrs. Schneider’s exclamation, made even before she fell, that Howard Schneider had shot her brother and herself.
*402 Other authorities extend the rule still further, so as to embrace the statements of third persons, especially where such statements are the immediate concomitant and result of the principal fact. Thus, in State vs. Walker, 78 Mo., 380, the exclamation of a bystander, addressed to one of the parties to an assault, “ Don’t strike, you have shot him now,” was admitted.
So, in Newton vs. Insurance Company, 2 Dillon, 154, the declarations of a third person that the deceased had shot himself, made immediately after the shooting; was admitted.
So, immediately after a robbery, the description of the robbers by the wife of the party injured, was received. Jordan’s Case, 25 Grattan, 943. In this case the wife testified on the stand, notwithstanding which,- her statement immediately after the robbery was also received.
The court said:
“ The wife of the prosecutor did describe to the jury the appearance and dress of the persons engaged in the attempted robbery. . . . But the Commonwealth was not necessarily restricted to this mode of examination. The description of the prisoners, given a few minutes after the occurrence, was more likely to be correct than any given on a subsequent occasion. On the trial, the wife of the prosecutor might fail to remember many particulars or details observed and remembered at the time of the robbery. Her description given to the witness a few minutes afterwards was a part of the res gestae.”
In fact, the spontaneous exclamations of bystanders, witnessing a tragedy, are as much the natural result and incident of it as those of the participants.
This applies with special force in the present case to Miss Jennie Hamlink, whose declaration was to the same effect as her sister’s. She was one of'the very group in which the double homicide was committed, the sister of both the parties killed. The shock to herself was only less than that of her sister. Her outburst of grief over the bodies still before her, her cries and exclamations to those around her inquir *403 ing the cause, would certainly appear as much a part of the main fact — a natural and necessary concomitant and incident of it as anything that could be said by another person than the one fatally wounded.
The principle once recognized, as it seems to be, that *the statements of third persons may, under some circumstances, be received as part of the res gestae, her case must be admitted to be as strong a one for the application of it as can be conceived of. The evidence as to her exclamations was first brought out in her own examination as a witness in this case, so that an opportunity was afforded to test their value by cross-examination.
A very important question relates to the admission of alleged dying declarations by Mrs. Schneider.
The authorities are not entirely harmonious on this subject, some of them laying down much stricter rules than the others.
The dying declarations of the party alleged to be murdered are generally admitted from the necessity of the case, against the party accused of the homicide, in relation to the immediate act and the circumstances under which it was committed, because the declarant is most likely to know the truth, and because otherwise his testimony must be lost, and because declarations made at such a time are supposed to be made under as strong a sanction and guaranty of truth as if he were under oath and on the witness stand.
It is conceded that such declarations are inadmissible unless made under a sense of impending death. As long as a lingering hope of recovery remains, they are entitled to no weight, and must be excluded.
Neither would it be sufficient that the declarant despaired of ultimate recovery, because that is consistent with the hope of indefinite continuance of life. But exactly how immediate must be the expectation of death, the authorities do not seem agreed or clear. Some would seem to confine the rule of admissibility to those made at the very point of death.
The weight of authority, however, does not seem to re *404 quire so strict a rule, but to justify the admissions if the declarant does not expect to survive the injury from which he actually dies, and the injury is such that it must be expected to result speedily in death. In the case of Thomas John, referred to in 1 East’s Crown Law, 357, 358, it was said by all the judges to whom it was referred, “And if a dying person either declares that he knows his danger, or it is reasonably to be inferred from the wound or state of illness, that he was sensible of his danger, the declarations are good evidence.”
And the state of mind of the deceased need not be proved exclusively by his expressions, but may be gathered from the circumstances of his condition. Wharton’s Crim. Ev., Secs. 284-286.
So, in McLean vs. State, 16 Ala. N. S., 672, it was held that the declarations of the deceased should be admitted in evidence, though he does not, at the time, state that he is conscious of impending death, if made under such circumstances as in the judgment of the court will reasonably warrant such an inference.
And in 1 Greenleaf, Sec. 558, it is said:
' “It is essential to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger or the opinions of the medical attendants stated to ,him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant’s mind.”
The deceased had received three pistol balls in her body on Sunday evening, and had undergone a severe operation, which failed to reach one of the balls; she was suffering excruciating pain, and on Monday morning she begged for *405 water, saying to her father and mother and the physician that she could not live, she could be with' them but a short time anyhow, and why not gratify her with a drink of cold water. And the night before she said to the professional nurse, several times, that she knew she could not recover, and once said, “Why didn’t he kill me outright; I am in torture.” She also talked on Monday as to the disposition she wished made of her things.
All this seems to indicate a belief that she would not survive the injury, and that death was approaching.
On Tuesday, she said she realized that she could not live and she was able to make her statement. Mr. Clagett asked her if she thought she was going to die, to which she answered “yes.” He further read over to her the formal heading, containing the statement of having abandoned all hope of recovery, and being in the face, as she believed, of impending death, and inquired if that was so; to which she assented. On the next day she expressed a desire that her husband might see her body after her death, that it might be the cause of reforming him, after repeating the request for water, and the declaration that she could live but a short time. In fact, there is nothing to show any change, at this time, in her state of mind, from what it was the day before when her formal written statement was made.
We think, upon this showing, that her ante mortem statements were admissible and the exceptions to their admission must be overruled. A part of her last statement, made on Wednesday, was objected to as argument. She was told that her husband claimed to have acted in self-defence, and that Frank Hamlink had shot at him. She said it was absurd — that Frank had no revolver and did no shooting. We see no reasoning in this, but simply an emphatic denial of her husband’s statements.
That part of the charge relating to dying declarations, and which is given in place of the tenth instruction asked by the defence, is criticised because it is’ said to give more weight to a dying declaration than to the testimony of a *406 living witness. We do not so understand it. In speaking of the objection to the admission' of statements which could not be subjected to the test of cross-examination, the judge simply said that the objection and disadvantage are overborne by the necessity of the case; in other words, the objection must yield to the necessity of the case.
A number of the exceptions group themselves around the question of seli-defence; not, of course, self-defence against Mrs. Schneider, but against a third person, her brother Frank Hamlink; and the question naturally arises, how far the theory .of self-defence finds a place in the case.
If Frank Hamlink fired the first shot at the defendant, as the latter claims, this, of course, would not of itself exonerate the defendant from the charge of killing his wife. Until the contrary is shown, the killing would be presumed malicious. The defendant’s first step in his defence would be to show that the killing was accidental and unintentional. Even this would not complete his case, for if he was unlawfully shooting at Frank Hamlink, and, in doing so, unintentionally and accidentally killed his own wife, it would be as much murder of the wife as if she were the intended victim.
It would be necessary, therefore, for him to show that he was acting lawfully in firing at Frank Hamlink, which he could only do by showing that the latter had made a deadly assault upon him, and that the shooting of Hamlink was necessary to preserve his own life or protect him from great bodily harm. This he would unquestionably have the right to do, but this right depends upon the assumption that the shooting of the wife was accidental.
And it is important to determine what is the drift or result of the evidence as to this question.
The evidence for the government tended to show that the defendant, directly facing his wife, and holding her right arm or hand with' his left, fired three bullets into' her body, all of which entered her body, in front, and passed towards the back and that, changing his position, he then shot her *407 brother. A fifth bullet, whether aimed at Mrs. Schneider or at her brother, is said to have gone through the window of an adjacent house.
In order to meet this evidence, which included the surgeon’s testimony as to the direction of the! bullets, the defendant testified that Frank Hamlink commenced the firing at him; that after the first shot, his wife, who had been facing himself, turned so as to face her brother, her left side being slightly inclined towards himself; that when the defendant drew his pistol, and -while he was returning Frank’s fire; his wife was at his right, rather back of his elbow, facing her brother. In -order to corroborate his statement, a large part of the evidence for the defence wais introduced to> show that more than the five shots of the defendant’s pistol were fired, and that Frank Hamlink therefore must have fired some of them. It was also- attempted to show that the first shot came from the 'direction where he stood.
This evidence was evidently intended to convey the impression, as it did indeed tend to prove, that Mrs. Schneider was killed by her brother.
.In all the evidence offered by the government, we can see nothing, from which it could rationally be inferred that the shooting of Mrs. Schneider, if by the defendant, was accidental. If a man is. shown to have fired three shots into -another person, at close quarters, from which death results, the act is presumed to be intentional' and .malicious, even without any direct proof of motive, malice express, or premeditation, and no inference that it was accidental could be justified by'the mere conjecture that it might, by possibility, have been accidental, or by the general presumption of innocence. Still less would this be the case where the proof is supplemented by evidence of actual bad feeling on the part of the slayer. The burden would be upon him of disproving the killing, or of showing that it was through misadventure or in -self-defence against the deceased.
The tendency of the defendant’s own testimony is only to show that he did not shoot his wife, either accidentally or *408 intentionally, but that she was accidentally killed by her' brother. And nowhere else in the testimony for the defence do we find anything which throws any light on the particular question of Mrs. Schneider’s position at the time of the firing and the possibility of an accidental shooting by the defendant.
The question, then, on the proof, seems to be between two-entirely contradictory accounts, the one showing an intentional shooting by Schneider, and the other an accidental shooting by Frank Hamlink.
There seems to be no room for the immediate theory of an accidental killing by the defendant. It is not, indeed, his theory, but that of his ingenious counsel. It is either mere conjecture that, in the alleged cross-firing between Frank Hamlink and the defendant, Mrs. Schneider may have received the bullets of the latter accidentally/ or else it is made out by assuming half the evidence on each side to be true,, and half to be false. It assumes, for example, the defendant’s statements that Mrs. Schneider was facing her brother while the latter was firing, and was at the defendant’s right side while he was firing, to be untrue, and the evidence of the government as to her position to be true; and, on the other hand, it assumes the government’s evidence that Frank Hamlink did not fire at all, to be untrue, and the defendant’s to the contrary, to be trué. And by placing together parts of the evidence in this way, this theory would place Mrs. Schneider in such a position that she might, by possibility, have received the defendant’s 'fire-in front. Even then, it would be difficult to see how the proof of accidental shooting is completed; and it seems, to-us that, however plausible, this theory finds no support in the proof, and that the jury had no other choice than to find either an intentional killing of Mrs. Schneider by the defendant or an accidental killing of her by her brother. '
If Mrs. Schneider was killed by her brother, the defendant could not be found guilty. Her brother, if he had survived, would have been accountable for it, unless he .had *409 shown it to be from misadventure, while he was doing something lawful, as, for instance, defending himself against the accused.
It might be true that Frank Hamlink commenced the shooting, and yet equally true that the defendant intentionally shot both his wife and Frank Hamlink.
If the defendant killed his wife intentionally, it is wholly immaterial whether or not he had first been assailed by her brother, and whether or not it was necessary to shoot her' brother, ini defence of his own life. Whether he ishot her with premeditation, or under a sudden impulse of anger, but without provocation from her, or in resentment for Frank Hamlink’s interference between them, or in revenge for being fired at first by Frank Hamlink, if such was the case, it would equally be murder of the wife.
In either view, the question of self-defence, as against Frank Hamlink, is foreign to the case. And this conclusion disposes of all exceptions to the exclusion of evidence and the refusal or modification of instructions and the language of the charge on this subject. We could not have found fault with the court if the jury had been told directly that there was no evidence from which they could justly infer an accidental shooting by the defendant.
The view we have announced disposes of the question of admitting evidence to show previous threats against the prisoner by Frank Hamlink. (See p. 242, record.)
. This evidence was offered to show that the defendant had reasonable ground to believe that his life was' in danger from his brother-in-law, and that he was justified in shooting in self-defence.
In this connection, reference may be made to a subject of very earnest complaint on behalf of the defendant, in connection with the testimony of Marion Appleby. He was in company with the defendant on the south' side of Q street at the moment when the latter crossed over to speak to his wife, and witnessed the shooting. He was produced on *410 behalf of the defendant, and was asked as to what Frank Hamlink had said about the defendant on a certain occasion, the object evidently being to show either threats or hostile expressions. This was ruled Out. On cross-examination, Appleby said that he may have admitted in the District Attorney’s office that the reason why he did not go over with Schneider across the street, was because he thought there might be trouble. Now, it is complained that Appleby was not allowed, in response to an inquiry by defendant’s counsel, to explain why he thought there might be trouble, and the jury were left to infer that his apprehension was caused by something communicated to him by Schneider, from all which they might also infer premeditation on the defendant’s part, and, moreover, the judge, in his charge, called attention to this avowal of Appleby, which he had not been allowed to explain. If the case was as thus represented, there was error. If Appleby had been asked the direct question whether his fear of trouble was caused by anything told him by Schneider, it would have been error to refuse to allow him to answer. But instead of that, the defendant’s counsel asked him the leading question whether he had heard anything from Frank Hamlink, or seen anything in his conduct that led him to believe there might be trouble. This was precisely what had been previously ruled out because the court thought there had not yet been laid any foundation for it, it being intended to lead up to .the) proof of self-defence. When it was first offered, counsel did not state the object of this evidence (p. 196), but afterwards it was made very plain, when Appleby was recalled for the defence, for the avowed purpose of showing threats by Frank Hamlink against the defendant in order to establish the theory of self-defence (pp. 242, 243).
If, as we think is the case, the fact of accidental killing-must be shown in order to make the fact that the prisoner was defending himself against Frank Hamlink, available for him in the defence of this case, it can hardly be gainsaid *411 that, at least at that stage of the trial, when the evidence as to threats was offered, no foundation had been laid for introducing that evidence, and the court was justified, for that reason, in excluding it.
The fact then remained that Appleby apprehended trouble, without explanation, and this without the fault of the court.
The defence offered to show by one J. B. Thomas (p. 189, Rec.) that Frank Hamlink, about November 26, before the shooting, was the owner of a pistol like that found near his person after he was shot. The court held it to be too remote. The reason assigned for excluding the evidence may not have been a good dne, but the error, if it was one, was fully cured, because the same witness, being afterwards called by the United States, testified to all that he knew on the subject on which the defendant’s counsel had interrogated him (p. 275). Independently of this, however, this evidence falls within the rule before announced as to all the evidence on the subject of self-defence.
The same may be said of the. sur-rebutting evidence offered by the defence in reference to the bullet holes in the clothing of the defendant. We consider the evidence of experiments made during the trial to be objectionable in itself; but independently of that, the evidence and the exceptions to its exclusion share the fate of the whole theory of self-defence.
Exceptions were taken to the refusal of the court to allow witnesses to give their opinions as to the number of pistols that were fired.
We think the justice was properly careful in attempting to confine' the witnesses to facts and exclude their inferences, which could just as well be drawn by the jury.
One Malone was allowed to state that he thought he heard seven shots; saw the flashes, and the first flash seemed to be going towards the street and the last to be shot into the sidewalk.
It is evident that the jury were as able, as this witness, to *412 form a conclusion, as to the number of pistols, and could not have been aided by that of the witnesses; and there was no error in excluding the latter as evidence.
And again, Mr. Lipscomb, who did not see the shooting, testified as to the number of shots and the rapidity with which they were delivered. It was his impression there were more than five shots. Surely his opinion as to the number of pistols in use could add nothing to his narration, and the jury were possessed of all the light he could give them, from which to draw a conclusion.
■These are examples referred to in the brief as illustrating this head of objection to the court’s rulings.
We do not think the authorities cited affect the question. As far as sounds are concerned, they simply go to the effect that their character and direction and the sources from which they proceed may be testified to by any witness. If the evidence offered here had been simply that the sounds were those of a pistol, and that they came from such a direction with reference to the position of the witness, they would have been within the principle of these rulings, and would probably not have been excluded.
But again, all this is only a part of the same theory of self-defence, which has already been commented on.
It is claimed that an important error was committed in allowing the witness, Mary Harris, to be examined on behalf of the United States, in rebuttal.
One Hannah Burgess, whose name was on the list of witnesses furnished to the prisoner, had testified in chief that she saw the defendant, immediately after the firing, drop or throw down a pistol, and run away.
After the defendant’s evidence was closed, the District Attorney offered to prove substantially the same thing' by one Mary Harris, with the statement that he had not known of this witness until' after the (testimony for the defence had been commenced. The evidence was objected to on the part of the defendant, first, because the name of the witness was not included in the list furnished to the prisoner, and *413 secondly, because the proposed testimony was not rebutting, but was properly testimony in chief.
The Revised Statutes of the United States, Sec. 1033, provide that when any one is indicted for a capital offence other than treason, a copy of the indictment and a list of the jury and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each juror and witness, shall be delivered to him at least two entire days before he is tried for the same.”
In the case of Logan vs. United States, 144 U. S., 263, in which the court held that the statute was not complied with by simply furnishing a list of the witnesses who had testified before the grand jury, the court said:
"There is no occasion to consider how far, had the government delivered to the defendants, as required by the statute, lists of the witnesses to be produced for proving the indictment, particular witnesses, afterwards coming to the knowledge of the government, or becoming necessary by reason of unexpected developments at the trial, might be permitted oü a special reason shown-, and at the discretion of the court, to testify in the cause.”
The court suggests this as, at least, an open question.
Now, we have no hesitation in expressing the opinion that the statute never was intended to preclude the United States from making use of any material testimony discovered during the progress of the trial, and all that it exacts of the prosecuting officer is that he shall, in good faith, furnish to the prisoner before the trial, the names of all the witnesses then known to him and intended to be used at the trial.
There was no error, we think, in overruling the objection to Mary Harris on the first ground mentioned.
The evidence was offered to rebut the defendant’s testimony as to having carried his pistol away from the place of the homicide and thrown it down in the alley. There may be a doubt whether it was strictly rebutting evidence, but, still, it does not follow that there was error in admitting it, for the simple reason that the order of proof may be regu *414 lated by the trial justice, in his sound discretion, and it is not only his right, but his duty, where, in.his judgment, justice requires it, to admit evidence at any stage of the case, though the party has no strict right to offer it. And it has been repeatedly held, under this head, that he may admit evidence in criniinal cases which is strictly evidence in chief, after the defendant’s case is closed. See Comm. vs. Blair, 126 Mass., 140; State vs. Alvord, 21 Conn., 46; Comm. vs. Meaiy, 151 Mass., 55; People vs. Maunausau, 61 Mich., 15. In the last case, which was an indictment for the larceny of a cutter, the court say:
“The respondents complain that this proof belonged to the primary case of the people; that it was a manifest injustice to them, as they could not get witnesses to meet it on the trial, and was not part of the rebuttal testimony.
We are not disposed to hold that it was not proper to be given in rebuttal, inasmuch as the defendants had denied having such a cutter; but, at any rate, it was in the discretion of the court to allow it.”
And, in the case of Commonwealth vs. Blair, 126 Mass., 40, which was an indictment for procuring an abortion, after the defendant’s case was closed, the government called another witness to prove that the defendant had in his possession an instrument adapted to the purpose of procuring abortions. The district attorney would not say that he had omitted this testimony from his case in chief unintentionally, but said he had been expecting to elicit the facts from the defendant on cross-examination. The evidence was, of course, excepted to, and yet the Supreme Court of Massachusetts said: “Its admission after the defendant had closed his case, was a matter of judicial discretion, and not a subject of exception.”
■ In a case of such importance as the present, we should consider it eminently proper, at any stage of it, to admit important evidence for either party, and such the evidence of Mary Harris evidently was.
Another item of rebutting evidence is to be considered in *415 connection with the cross-examination of defendant’s witnesses which had been excepted to in two cases.
When the witness Holbrook was on the stand on behalf of the defence/ lie was asked whether he did not state ]tx> a person named, that there was a man on the jury, and “ you bet he knows how I want the case to go”; and when after-wards recalled, was further asked whether he had not said that “ when he hears wh'at I have got to say, he will tremble.” As this was .emphatically denied by the witness, and not proved, we cannot say that any harm was done by it.
The witness, however, admitted, and in this agreed with a witness subsequently called for the Government, that he said lie was going on the stand to testify thus and so, and there was a man on the jury who had worked for him for years, and who would believe him, although some people might think he was lying. This statement did not reflect upon the character of the witness, but, taken in connection with' his statement that he had extensive business relations with the defendant’s brother; had seen him, and had conversation with him on the evening of the killing, and gone to his house the next night, it had some'tendency to show bias and a personal interest in the case; which it is always competent for the opposite party to show.
Another witness, James Walker, for the defendant, was asked whether he did not say, in presence of several persons, that there were niggers on the jury who could be bought, and the defence is rich, and on his denying it he was contradicted by the rebutting testimony. It would depend much upon the tone and manner in which such a remark was made, whether it would indicate a personal bias on the part of the witness or not. He might desire the prisoner’s acquittal and utter this language — coarse as it was — hopefully, or, on the other hand, he might use it deprecatingly, and it is difficult for a reviewing court, not seeing and hearing the witnesses who detailed it, to judge. In the former case it would go to his disinterestedness as witness. His denial of its use at all, contradicted by two witnesses, would rather seem to indicate the former.
*416 At all events, the Justice took pains to limit its effect to the credibility of the witness, and we are unable to say that it necessarily or probably had any other effect.
The complaint is that it tended to antagonize the jury to •the witness, to the injury of the defendant. We should not approve the introduction of evidence having only this result. But we cannot subscribe to the doctrine which seems to us to have been carried to an absurd length in some of the courts, that the jury are to be treated as children, liable to be swerved from their sworn duty by every indiscreet statement calculated to wound the feelings of one or more of them; and that a long, painful and laborious trial should be held abortive because one of a cloud of witnesses is shown to have said something so calculated, simply because of a possible or conjectural detriment to the cause of the defendant, of which no actual trace can be seen, cannot be(, in our judgment, successfully maintained.
In the case of Cross, we held unwarrantable offers of evidence ground for reversal only when it appeared that the effect of such offers was not counteracted or obliterated, and that it was not only probable, but almost certain, that their effect upon the jury was prejudicial to the accused. We cannot discover evidence of any such result in this case to justify an overthrow of the judgment.
Exceptions were taken to the refusal of the court to admit certain evidence offered by the defendant in sur-rebuttal.
The defendant had testified that in his flight from the scene of the homicide he passed through a certain alley. The Government desired to show that this was not true, because the alley was muddy and the prisoner’s shoes, when he arrived at the police station, showed fio signs of mud.
Having crossi-examined the prisoner on this subject, the District Attorney offered evidence tending to show the muddy condition of the alley and the cleanness of defendant’s shoes. The defendant afterwards offered a witness to prove that the alley was not muddy and the evidence was *417 excluded, on.the ground that this matter was exhausted in making out the defendant’s case; in other words, that it was a proper part of the defendant’s case, to which he had already addressed his testimony, and he could not introduce new testimony on the same subject as sur-rebutting.
The judge seems to have been mistaken in the reason assigned for rejecting the proof. It appears from the testimony before us that the defendant had not offered proof of the condition of the alley, as a part of his case, but only referred to it on cross-examination and in answer to questions by the District Attorney.
If he was contradicted as to these answers he had a right to rebut the contradicting testimony. The mistake was one which any judge might easily fall into from want of recollection of the testimony in a long trial.
But on examination pf the evidence, we find that the defendant had not been contradicted by the Government. The defendant said himself, on cross-examination, that the alley seemed to him to be muddy in the center, and therefore he ran close to the fence to avoid it, and that his patent leather shoes were not muddied. And his witness, McAndrews, who went in search of the pistol, said that his own boots were not muddied and the pistol had no mud on it.
Riley, called for the United States, said, portions, of the alley were muddy, and portions dry; could not say whether he got any mud on his shoes; would say that the alley was muddy from the telegraph pole to Madison street. It is evident that the statement of Riley and the defendant were entirely consistent. The defendant was not contradicted. An expert from the United States Weather Bureau was called, who had no personal knowledge, and could throw no light upon the question.
It seems, then, there was nothing to sur-rebut, and no harm could have been done the defendant by refusing to admit the superfluous testimony offered.
Another instance of the alleged wrongful refusal of surrebutting evidence offered by the defendant has been dwelt *418 upon. The defendant was cross-examined as to his ownership of pistols. This was not merely collateral matter. The prisoner asserted that he never owned more than two pistols, one a 32-caliber, which he had bought from one Walford, and which he shortly afterwards exchanged with him for a 38-caliber. He was asked whether he had not sold or traded a 32-caliber pistol to one Leroy Willett, representing that he had bought it from Walford, and on his denying it, he was contradicted by Willett.
The defendant then offered to show by Walford’s salesman that defendant had in fact bought the 32-caliber from him and afterwards exchanged it for a 38-caliber. It is evident that this did not contradict Willett’s statement that the prisoner had also sold him a pistol and represented it as having been bought from Walford. Willett’s testimony tended to show that the prisoner had other pistols than he admitted, and tended to weaken his whole testimony on this subject.
The evidence offered in reply to him was not therefore properly sur-rebutting.
I have now noticed the principal questions that have been presented and dwelt upon in argument, which arose first upon the case of the Government, then upon the case of the defence, then upon the rebutting testimony of the Government, and then upon the sur-rebutting testimony offered for the defence.
There are, however, in the brief of defendant’s counsel two general allegations of error, embracing a number of particulars, under the following heads, viz.:
“Improper cross-examination and contradiction of defendant on matters purely collateral, to his prejudice,” and—
“ Improper limitation of cross-examination, and other .matters purely collateral to any issue on trial, improperly admitted in evidence, to the prejudice of the defendant.”
Under these heads we are referred, simply by the paging of the record, to about forty different Specifications of error. We have been at pains to examine each one of these items *419 of evidence. Some of them have been disposed of in what has already been said. We were satisfied that much of the evidence objected to went fairly to the credit of witnesses; other matters claimed to be collateral were not so, because they showed the personal bias of the witnesses in this particular case; part of them were the searching but legitimate cross-examination of the prisoner himself; and that none of them were plain errors or such as could be of any detriment to the defendant.
As an illustration of this kind of evidence, reference may be made to the cross-examination of T. Franklin Schneider, brother of the defendant. He was asked in substance whether he had not proceeded to foreclose a deed of trust on Dr. Bean’s property since the latter had testified in the case adversely to the prisoner. On his denying it, Dr. Bean was called to the stand to contradict him. Objection was made that this was a collateral matter. But it is never a collateral matter to show a personal interest of a witness in the suit, and where it is manifested in an effort to punish another witness for his testimony, it is especially relevant.
We come now to the instruction, jj'hree were granted at the instance of the Government.
The defendant excepted to the granting of these; but we are unable to see any solid objection to them. The criticism of them in the brief seems founded in an entire misconception of their import and not sustained by any authority.
Sixteen instructions were asked on behalf of defendant. Some of them have been anticipated and commented on in what has already been said.
The second instruction related to the subject of reasonable doubt. The judge, refusing to give the instruction as asked, gave an instruction on the same subject in his charge, borrowing it, as he said, from the Supreme Court of the United States (approved in the case of Hopt vs. Utah).
The objection seems to be, that if the court chose to substitute for the instruction asked, a form approved by the *420 Supreme Court, he ought to have given the whole of that, whereas he omitted an important part. The part so omitted was, “ That if you can reconcile the evidence before you upon any reasonable hypothesis consistent with the defendant’s innocence, you should do so, and in that case find him not guilty.” In fact, the judge told the jury that the evidence must satisfy the jurors as to the guilt of the defendant, so as to exclude any other reasonable conclusion, which expresses the same idea.
The third instruction is faulty in requiring proof of premeditation and deliberation, or else that the defendant was engaged in some unlawful act, from which malice is presumed, without giving the jury the slightest idea what acts raise the presumption of malice, and in fact it excludes the case of an unpremeditated deadly assault, without adequate provocation. '
The fourth instruction and the sixteenth taken together undertake to state the law as to manslaughter. The fourth mixes up the law of manslaughter and self-defence. The sixteenth would make killing in passion without any provocation manslaughter. The law of manslaughter is sufficiently stated in the charge.
In this connection there is an exception to a part of the charge in which the judge said that in his opinion there was no evidence of passion recently excited, such' as would reduce the killing to manslaughter, and that the defendant had put his defence on the ground of fear of death at the hands of Frank Hamlink, and had not claimed that he was carried away by passion. This is substantially correct. The defendant did not pretend that his wife had offered any provocation that could induce a transport of passion, nor did he claim that Frank Hamlink had excited him by mere assault or any other provocation short of a direct attempt on his life, which at once put him upon his self-defence.
The fifth instruction is, in substance, that if Frank Ham-link made an assault on defendant such as to give him reasonable ground to apprehend danger to his life, he was jus *421 tifiable in defending himself even by taking Hamlink’s life, and if in so doing,he unintentionally and accidentally shot his wife, he should be acquitted.
The court granted this, 'with the modification that the shooting of the wife should not have been careless or negligent. Inasmuch as the careless killing of another is involuntary manslaughter, it was correct to refuse to direct an acquittal on that hypothesis.
The sixth instruction asked was only a variation of the fifth, as to the law of self-defence, and was properly modified in the same way.
The seventh claims that if the prisoner, in defending himself against Frank Hamlink had shot his wife, he should be acquitted, which would include the case of an intentional shooting of the wife, and the court only granted it with the modification that the shooting should appeal- to be unintentional and accidental, and without carelessness.
The eighth, -eleventh' and fifteenth, all contain the proposition that if the jury entertain a reasonable doubt whether the defendant fired the shot which killed his wife in self-defence against Frank Hamlink, he must be acquitted. In other words, if the jury entertain a reasonable doubt whether the defendant has made out a defence, they must act as if he had done so to their satisfaction and acquit him. The instruction then would be that if they had a reasonable doubt whether the Government had made a case, they must acquit, and if the Government has made a case, and they entertain a reasonable doubt whether the defendant has shown any defence to it, they must, equally, acquit.
It is hardly necessary to say that no authority has been, or, we think, can be cited for so extraordinary a proposition.
But as already mentioned, as the whole theory of self-defence rests upon the assumption of an accidental shooting, we think the judge would have been justified in declining to grant any of the prayers asked on that subject.
The twelfth instruction required each and every juror to be convinced beyond a reasonable doubt. If such an in *422 struction would not be erroneous, still it was not error to refuse it. The jurors perfectly understood that their verdict must be unanimous, and that they must all be satisfied beyond a reasonable doubt. Hence, such an instruction was altogether unnecessary.
We doubt also whether its tendency would not have been mischievous, as encouraging the jurors to obstinate adherence to their individual opinion, instead of a candid interchange of sentiments and efforts to harmonize their views so as to , arrive at a unanimous conclusion. This subject was commented upon somewhat in the case of State vs. Smith, 49 Conn., 376, in which a somewhat similar instruction was asked, the court saying:
“The prisoner next complains of the court for not complying with his request to charge that ‘ each juror in this case must be governed by his own judgment, founded upon the law and the evidence, and must not be governed, controlled or influenced by the judgment or opinions of others in agreeing to a verdict.’
“We think this is not sound law, and that the court would not have been justified in complying with their request. Although the verdict to which each juror agrees must, of course, be his own conclusion, and not a mere acquiescence in the conclusions of his fellows, yet in order to bring twelve minds to a uhanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other. In conferring together the jury ought to pay proper respect to each other’s opinions, and listen with candor to each other’s arguments. If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are *423 for acquittal, the minority ought serioúsly to ask themselves whether they may not reasonably and ought not to, doubt the conclusion of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows. This is substantially what was stated to the jury in Commonwealth vs. Tucey, 8 Cush., 1, and sanctioned by the Supreme Court of Massachusetts.” ^
The thirteenth instruction is in substance that evidence of a desire on defendant’s part to procure a divorce from his wife peaceably through the courts is not legal evidence of a criminal intention or sufficient to justify a presumption of intentional killing. We presume no one would contend the contrary of this, but it is not correct practice to single out isolated facts in this way and ask instructions as to their legal effect, when a number of facts and a whole course of conduct are relied on, collectively, as showing a motive.
The fourteenth instruction would require the jury, as a legal duty, not to attribute an unlawful intent to an act, if it can .reasonably be attributed to a lawful intent. We are not aware of any precedents as authority for such abstractions. On the contrary, in Reeves vs. State of Alabama, 11 Southern Rep., 158, it was held that it is an invasion of the province of the'jury to charge that when a good or bad motive for doing an act can be imputed to the person doing the act, the law says that the good motive must be imputed, if the same can be done from the evidence reasonably to the satisfaction of the jury.”
The instruction as to reasonable doubt would seem to embrace everything intended to be claimed by this one. (See Mitchell vs. State, 10 South. Rep., 518.)
There were sundry exceptions also to the charge. Some of them have been anticipated in what has been already said.
The first exception is to a general reference by the court to miscarriages of justice in other cases, because it implies *424 that a verdict of acquittal in the present case would be another example. We are sure that no such idea was intended to be conveyed to the jury, and that no such implication results from the language.
It is also objected that the court commented on the language of counsel in reference to the preconceived opinions of some of the jurors, to the prejudice of the defendant. The record does not show what.language had been used by counsel, but it is inferrible from that of the court that it had been in the nature of a criticism on the ruling of the court in adjudging several of the jurors to be competent and an assumption that several of them were prejudiced and'unfavorable to the prisoner. It was proper for the judge, in reply, to reiterate his decision as to the competency of the jurors and to controvert the propriety of the counsel’s remarks and whether all the reasons assigned by the court were correct or not, we see no impropriety in the conclusion.
The charge is excepted to also because the court said that “ a person accused of crime has a right to require that the charge against him shall be legally established by evidence before he shall be convicted. It is a valuable safeguard that accompanies him to that point, and then, having answered its purpose, leaves the accused bare to the grasp of conviction.”
Authorities are cited to the effect that the presumption of innocence never deserts the accused until a verdict of guilty is returned. If these cases mean to say that an accused party is still to be presumed innocent by the jury, although they are satisfied by the evidence of his guilt, they announce an absurdity. If they mean anything different from that, we fail to see anything in it but a metaphysical abstraction of no- practical application.
It is further objected that the jury were rather invited to render a verdict against the accused by the statement that if the court had erred in its rulings the defendant had his remedy in a higher court. In truth, the court was endeav *425 oring to obviate any prejudice against the defendant in the minds of the jury that might arise from the fact that so many rulings had been made against the prisoner’s counsel, and admitted that in some of them there might be error, which the prisoner might have redressed in a higher court; but the jury were expressly told that this was not a matter about which they should concern themselves. In other words, they were neither to infer anything against the prisoner from the court’s rulings against him on questions of law, nor were they to question those rulings in the present case, but were to assume them to be correct until reversed. This is only a fair statement of the law.
But the most important objection to the charge relates to the comments of the court on the evidence. There were two objections under this head.
In laying down the law of self-defence, the court qualified the instruction with the language: “The court does not, however, remember or recall any evidence in this case, and, in my opinion, there is none that tends to show an accidental or unintentional killing of the deceased by the defendant.” And, again: “If you find no evidence to justify the theory •of unintentional or accidental killing of the deceased in defence of an attack from Frank Hamlink, you should disregard that theory entirely.” And, again (p. 349, Rec.): “ If you find anything in the evidence to justify your consideration of this defence.” All this, it is said, is an intimation to the jury that there was no evidence to sustain the theory of the defence.
And it is further objected that the whole discussion of the facts in the charge was an abuse of the authority of the court, was an argument rather than a summing up, and virtually took the determination of the facts from the jury.
It must be remembered that the defendant admitted the firing of five bullets, and the evidence for the Government accounted certainly for two, one of which had gone through a window and the other into the body of Frank Hamlink, and strongly tended to the tracing of the other three into *426 the body of Mrs. Schneider; so. that the whole burden of proof was thrown upon the defendant, and the jury were to ascertain the merits of the defence from a large mass of evidence. Under those circumstances it was certainly proper for the court to direct the attention of the jury to the questions of fact which ought to engage their attention in reaching a conclusion. As long as they are made fully to understand that both' the authority and responsibility for the determination of the acts rests with them, it is almost impossible to lay down a rule which shall control and measure the language of the judge in laying down the facts before them. The very intimation of want of evidence, which is complained of here, has been passed on by the Supreme Court in the case of Rucker vs. Wheeler, 127 U. S., 85. In that case an action had been brought for commissions upon the sale of property. The Supreme Court say, the trial justice said:
“ ‘ I do not see that this evidence proves, taking all that is said about it by these witnesses, a contract on behalf of the defendant to purchase this property through the plaintiff. I say now, generally, upon this branch of the case that it must appear to you, from the evidence that there is an agree-, ment between the plaintiff and defendant, Mr. Rucker and Mr. Wheeler, to the effect that Mr. Rucker was to secure this property for him, and that he was to pay him for that service. The agreement which appears to be stated by Judkins and by Devereux is not of this character; that is, that was an agreement that Judkins would purchase with somebody else, and of course Judkins would be chargeable with' the commission if it was carried out.’
“ It is insisted by the plaintiff that the court went too far in its expression of opinion upon the evidence bearing upon this issue, and that what was said had practically the effect of taking the case from the jury. It is no longer an open question that a judge of a court of the United States, in submitting 'a case to the jury, may, in his discretion, express his opinion upon the facts; and that ‘when no rule of law is in *427 correctly stated, and all matters of fact are ultimately submitted to the determination of the jury/ such expression of opinion is not reviewable on writ of error. Whether the parties made such an agreement for compensation to the plaintiff as that alleged was the only issue made by the first count of the complaint; and that was a question of fact to be determined by the jury. Their right to determine it was distinctly recognized in that part of the charge which immediately followed the court’s expression of opinion as to certain portions of the evidence, namely: ‘ If you can find anything in the evidence to support the conclusion that the defendant made an agreement with plaintiff to pay this commission, and that the property was afterwards purchased by him in pursuance of that agreement, then the plaintiff is entitled to recover; otherwise he is not entitled to recover.’ Indeed, we are not sure but that the court might properly have given a peremptoiy instruction in favor of the defendant upon this branch of the case.”
We have already said that the court might have safely declined to give the instructions as to self-defence at all, on the ground that there was no evidence on which' to base it, instead of submitting it to the jury to find whether there was evidence.
Perhaps the rule on this subject of the judge’s comments on the evidence is stated as explicitly as anywhere else, in the cases cited in the briefs of Mitchell vs. Harmony, 13 How., 115, in which Chief Justice Taney said:
“ The passages in relation to questions of fact are nothing more than the inferences which in the opinion of the court were fairly deducible from the testimony; and were stated to the jury not to control their decision, but submitted for their consideration in order to assist them in forming their judgment. This mode of charging the jury has always prevailed in the State of New York, and has been followed in the Circuit Court ever since the adoption of the Constitution.
“ The practice in this respect differs in different States. *428 In some of them the court neither sums up the evidence in a charge to the jury, nor expresses an opinion upon the question of fact. Its charge is strictly confined to questions of law, leaving the evidence to be discussed by counsel, and the facts to be decided by the jury without commentary or opinion by the court.
“But in most of the States the practice is otherwise; and they have adopted the usages of the English courts of justice, where the judge always sums up the evidence and points out the conclusions which, in his opinion, ought to be 'drawn from it; submitting them, however, to the consideration and judgment of the jury.
“ It is not necessary to inquire which of these modes of proceeding most conduces to the purposes of justice. It is sufficient to say that either of them may be adopted under the laws of Congress. And as it is desirable that the practice in the courts of the United States should conform, as nearly as practicable, to that of the State in which they are sitting, that mode of proceeding is perhaps to be preferred which from long established usage and practice, has become the law of the courts of the State. The right-of a court of the United States to express its opinion upon the facts in a charge to the jury was affirmed by this court in the case of McLanahan vs. The Universal Insurance Company, 1 Pet., 182, and Games vs. Stiles, 14 Pet., 322. Nor can fit be objected to upon the ground that the reasoning and opinion of the court upon the evidence may have an undue and improper influence on the minds and judgment -of the jury; for an objection of that kind questions their intelligence and independence; qualities which cannot be brought into doubt without taking from that tribunal the confidence and respect which so justly belong to it, in questions of fact.
“ It was in pursuance of this practice that the proceedings set forth in the exceptions took place. When the testimony was closed and the questions of law had been raised and argued by counsel, the court stated to them the view it proposed to take of the evidence in the charge about to be given. *429 And it is evident, from the statement in the exception, that this was done for the purpose of giving the counsel for the respective parties an opportunity of going before the jury to combat the inferences drawn from the testimony by the court, if they supposed them to be erroneous or open to doubt.
“It appears from the record that the counsel on both sides declined going before the jury, evidently acquiescing in the opinions expressed by the court, and believing that they could not be successfully disputed. And the judge thereupon charged the jury that if they agreed with him in his view of the facts, that they would find for the plaintiff, otherwise for the defendant; and upon this charge the jury found for the plaintiff, and assessed the damages stated in the proceedings. It is manifest, therefore, that the Circuit Court did not, in its instructions, trench upon the province of the jury, and that the jury could not have been misled as to the nature and extent of their own duties and powers. The decision of the facts was fully and plainly submitted to them.”
In Simonds vs. United States, 142 U. S., 148, the judge refused to discharge the jury at their request because they' could not agree, stating substantially that in his judgment the testimony was convincing and he could not understand the failure to agree to arise from any difference as to facts. If any language could be held to have the effect of- constraining them to find against the prisoner, this might fairly be so held. The jury did agree to a verdict of guilty. The Supreme Court found no error in the action of the judge. The trial justice said:
“ I have the right, under the laws of the United States, to give you my opinion on questions of fact, but I refrain from doing so because I am well satisfied of your capacity to understand what has been testified to in all these days that we have been here engaged. I shall confine myself to stating to yQU the law by which you are bound, simply calling your attention to the questions of fact which are to be decided *430 by you, for, as you know, juries decide questions of fact, and not the court.”
On the next day the jury came into court and asked to be discharged from further consideration of the case. To this request the court, after ascertaining by inquiry that the jury required no further instructions in matter of law,, replied as follows: “This case has occupied a long time. It is a case of importance, and the discharge of the jury at this time would involve another trial. It seems to me that that should not be had unless in. a case 'of necessity. I see in this case no such necessity. I cannot understand the failure to agree arises from any difference of opinion based upon the insufficiency of the evidence in this case. Whenever, in the opinion of the court, the testimony is convincing, it is the duty of the court to hold the jury together. Therefore I must decline your request to be discharged.”
“The defendant excepted to the judge’s statement to the jury that he regarded the testimony as convincing.”
And yet the Supreme Court said:
“The only other exception argued is to the statement made by the judge to the second jury, in denying their request to be discharged without having agreed upon a verdict, that he regarded the testimony as convincing. But at the outset of his charge he had told them, in so many words, that the facts were to be decided by the jury, and not by the court. And it is so well settled, by a long series of decisions of this court, that the judge presiding at a trial, civil or criminal, in any court of the United States, is authorized, whenever he thinks it will assist the jury in arriving at a just conclusion, to express to them his opinions upon the questions of fact which he submits to their determination, that it is only necessary to refer to two or three recent cases in which the judge’s opinion on matters of fact was quite as plainly and strongly expressed to the jury as in the case at bar.”
Other cases cited in the brief, such as Carver vs. Jackson, 4 Pet., 80, and Hayes vs. United States, 32 Federal Reporter, 662, sustain the same general doctrine.
*431 In Carver vs. Jackson, Judge Story said:
“With the charge .of the court to the jury, upon mere matters of fact, and with its commentaries on the weight of evidence, this court has nothing to do. Observations of that nature are understood to be addressed to the jury merely for their consideration, as the .ultimate judges of matters of fact, and are entitled to no more weight or importance than the jury, in the exercise of their own judgment, choose to give them.”
In the present case, the Justice, after calling the attention of the jury to matters which in his judgment they ought to consider, in connection with the defence, said:
“These suggestions are made to you, gentlemen of the jury, not by way of attempting to take the evidence from you at all, or from your sole consideration. You are the sole judges of the evidence; but the court has thought it only right and proper, in this case, to suggest to you some considerations which should attend your deliberations upon the evidence.”
In the light of the authorities cited, it is impossible for us to find the Justice’s comments on the evidence were error which subjected his judgment to reversal.
There are perhaps several questions of subordinate importance arising upon the exceptions taken during the trial, which I have not commented upon, partly for want of time; but we have given them our attention, and they do not affect our general conclusions as to the case.
After the verdict a motion was made for a new trial, because of the errors alleged, which have already been discussed, and also because the evidence was insufficient to sustain the verdict, and the overruling of this motion is one of the grounds of the appeal.
It could not be expected that we should enter upon an extended review of the evidence contained in this bulky record, in order to show the grounds of our opinion as to its sufficiency to sustain the verdict. It will suffice to say that we have carefully examined it and deem it amply sufficient to justify the verdict.
Note. — After the foregoing opinion was delivered, an application was made by the defendant to the Supreme Court of the District of Columbia for a writ of habeas corpus, which' was denied. The defendant then applied for a writ of error to the Supreme Court of the United States, to review the judgment of the lower court upon that applicar tion. The Supreme Court refused to grant the writ.
Defendant also applied to the Supreme Court of the United States directly for leave to file a petition for a writ of habeas corpus to the warden of the District jail, and a writ of certiorari to the clerk of the Supreme Court of the District of Columbia. Leave to file the petition was denied, because the ground of the application related to an alleged error in the proceedings of the lower court, and did not go to its jurisdiction or authority.
(In re Schneider, Petitioner, 148 U. S., 157).
Reporters.
I am free to say that under the strong presentation of this case on behalf of the defendant, I was left in doubt, at the conclusion of the argument whether there were not serious errors in this record. Upon a critical examination, some of these apparent errors have turned out not to be real, some of them if real were in the reasons and not in the conclusions of the trial justice, and some of them if real were cured in the further progress of the trial, examples of all three of which I have discussed.
On a review of the whole case, we have not been able to discover any substantial error that would justify us in reversing the judgment of the Criminal Court, and ordering a new trial.

The judgment, therefore, is affirmed.